Thanks for this panel. I welcome those in the audience in the administrative office and other such locations, but anybody else who is here as a guest or observer are welcome to, of course. I point out a matter of some interest to us, which is that you stay alert to the clock that is on the podium. Yellow light, start to wrap up. Red light, stop. We may give you more time, may not. Certainly when the red light's on, but somebody, you're responding to a question, go ahead and finish your answer to the question. A matter that sometimes comes up, so I'll note it now. Rebuttal is for . . . rebuttal only. Don't save something if you're the appellant, to address only on rebuttal and not raise it in your opening. I will call the first case of the day, United States v. Raymond Reggie. Ms. Adelson? Is this the mic? Yes. Okay. It's a new mic. Doesn't look much like a mic, does it? Yeah, no. Good morning, Your Honors. I intend to address first the issue of the continuance, then the plea withdrawal, and if time permits, I might get to some of the sentencing issues. I've also provided the court, which I hope you have, with a calendar with ROA references, because that may help with the timeline perspective, which is important in this case. Slurred speech, mush brain, difficulty putting words and events in the proper order, these were all the fresh effects of the stroke Reggie suffered on October 6th, just two weeks before he was scheduled to begin his trial. Before he was even released from the hospital, the trial court granted him a one-week continuance only. He was released on October 20th, and then two days later underwent outpatient heart surgery. He had a heart loop monop permanently embedded in his chest. The very next day, recognizing his counsel's condition, a stroke and heart surgery, his client's condition, counsel sought an additional continuance, really two continuances. Counsel sought a 30-day trial continuance, but he also sought just two days so that Reggie could go see his neurologist, his first follow-up visit with his neurologist, which was scheduled for the following Wednesday, October 29th. The court had wanted documentation from the neurologist, and this was the first opportunity for him to get it. The neurologist would not see Reggie any sooner because of the heart surgery. The very next day, knowing about this follow-up visit, the court denied any future continuances, insisting that the trial proceed on October 27th. When the court denied the continuance, it knew that Reggie suffered from speech impediments. It had received sometime earlier, a few days earlier, a letter from the attending physician at the rehab center. I will tell you this, and I'm only speaking for myself, and my colleagues may disagree. I think it was outrageous that the judge denied the continuance as to the October 27th. However, I'm not sure that's good enough for you to get where you're trying to go, because the problem is, instead of showing up for trial and saying, I'm not able to go forward, and then being pushed to trial, and then appealing that, Mr. Reggie pled guilty. And so now we're in a different world, which is trying to withdraw this plea some six months later. It's not on your calendar, but it was quite a bit of time later. How can we ignore the fact that the plea is kind of an intervening cause of where we are today, between the judge's, in my view, improper denial of the continuance, and where you stand now? You've got this intervening cause of the plea. Well, that's true, and I will discuss the plea withdrawal and why the denial of that was also an abuse of discretion. But when Reggie had that decision to make on October 27th, he was a mess. He was a mess. Okay, he was a mess, and his lawyer let him plead guilty. His lawyer didn't say, Mr. Reggie doesn't know what he's saying, Your Honor. He's up here pleading guilty to you, and I can't participate in this because he's a mess. He doesn't know what he's saying. He doesn't know what he's doing. He doesn't understand anything. There was none of that. He got up for his last speech and sang 8-4 instead of 84 and things like that, but there was no indication that he didn't understand he was pleading guilty, and his lawyer didn't say that. So how can we ignore that? You're essentially asking us to kind of ignore that. The question to me is, did he really have an option to go to trial? A trial is a fundamental right to have a fair trial. You have a right to testify in your own defense. You have a right to assist counsel. So if he had made the decision, assuming it was really a decision to go to trial, he knew he couldn't take the stand, and his testimony was the foundation of his defense. He was going to explain to the jury why the payments that he received reflected a nontraditional pay structure with Craig, the super majority owner of SAG. He couldn't do that. Who knows what he would say? He certainly couldn't withstand cross-examination. Physically, we don't really know whether he could have the capacity or the stamina to that he was scared. He was just plain scared as to what would happen if he had to sit in that courtroom for two weeks when he was so debilitated. The court asked repeatedly, repeatedly, for a letter from a doctor and didn't get it. Repeatedly. Well, first, the court did get a letter, okay, which the court disregarded. It got the letter from Dr. Reddy that specified But Dr. Reddy invited the court to call him if she needed more information, which she did not do. That's not how the system works. Well, courts do that all the time. In all the cases cited by the government, you see judges actively intervening to make sure the defendant before them is capable of taking the stand. But in addition, that's where the two-day continuance becomes so important. She wanted a letter from a neurologist. Counsel said, I can get you a letter from a neurologist. I can get you the letter if you just put the trial off for two days. And the court wouldn't even put it off for two days. And there was no pressing reason not to. Let me ask you this. The October 29th meeting with the neurologist, that did occur, did it not? Yes. And then it was not, though, I thought, until the motion to withdraw the guilty plea that that letter was actually presented to the court. Is that correct? That is true. So there was no effort immediately after the October 29th neurologist to introduce that to the judge, to introduce that to the court? No, I don't believe there was. Which sort of segues into the plea withdrawal motion and the seven car factors, and was there a just and fair reason to allow Reggie to withdraw his plea? Before you do that segue, which is important to do, it does seem to me that the central problem already addressed by both of my colleagues is that the district judge was asking for certain kinds of information, maybe being overly impatient about it, perhaps in other ways not fully honoring the problems that may have existed with your client. But nonetheless, she did not get the kind of professional written information that she was asking for, and by October 29th, you could have had that kind of information. Why was there no effort then? The trial would have already begun. A jury would have been sworn in. They would have to declare a mistrial if the court thought that letter was sufficient. It was, and there's no assurance that you would have. Wouldn't it be better than being guilty when you're innocent? Excuse me? Wouldn't it be better to go and get that neurologist's letter than to plead guilty when you're innocent? I mean, your client is saying, he says... I'm sorry to interrupt. I really am. But she wasn't going to let Reggie get that letter until Friday. This trial was going to start Monday. It was planning on being a two-week trial. The direction she gave is, I'm not letting you go on the 29th. You can go on the half-day because it was Halloween. So Reggie was going to have to be there for five days of trial. I don't know what evidence would have come in, unable to assist counsel for five days, unable to go through the financial documents at issue, and maybe even by that time ready to take the stand. So it wasn't like the court said, okay... Let me ask you this more pointedly. As we sit here today, what evidence do we have from a doctor that he wasn't capable of understanding the plea that he made on October 27th? That he didn't understand what he was doing. He wasn't capable of making the decision he made on October 27th. What evidence do we have on that? To be frank, I don't think that's really the issue. Did he understand? I get to decide what is the issue, counsel. I don't know that we have evidence that his cognitive ability to understand that he was pleading guilty was impaired, but his right to testify was impaired. And what medical evidence do we have of anything regarding October 27th? Okay, we have Dr. Reddy's letter specifying three conditions, two of which affect speech. We have... What evidence do we have that would suggest anything about his ability to make the decision and give the answers that he gave on October 27th? I think we have the transcript of the plea elocution is one piece of evidence. That's not medical evidence. What medical evidence do we have? The medical evidence the court had by then, and again, she put a lot of restraints on counsel because she would have had more. She had the Dr. Reddy's letter, which I don't think should be dismissed because it specified three conditions, which are very easy to look up and find that they are stroke conditions that impair speech. And he invited her to call, and he said specifically, my patient is unable to attend or prepare for trial. I'm going to try again because I'm going to assume you're not deliberately not trying to answer my question, so I'm just not asking it well. We know there was a plea hearing on October 27th. That has been some time in the past. What evidence do we now have today on April 6th that would show us that on October 27th, Mr. Reddy did not understand what he was doing when he pled guilty or would impact his ability to make decisions on October 27th about pleading guilty? I think he did understand he was pleading guilty. What I'm saying is I think there are a lot of different ways to be coerced, and whether or not you understand that you're pleading guilty is only one factor. Whether you're pleading guilty because the court has abdicated its responsibility to make sure you have a right to testify in your own defense, to make sure that you can exercise your right to assist counsel, is a different question. And if you're asking what evidence we have that those rights were clearly at issue in this case, then I would say the plea allocution transcript reflects a sophisticated businessman unable to even speak. I got that. Let me ask this then. So he pleads guilty under coercion and all that. Then he sees the neurologist on October 29th, which you feel is the big moment when he can finally get some medical evidence. Why not at that point move to withdraw the guilty plea? Now that we have the neurologist, he's confirmed difficulties with speech, he can write a letter that's a bit more comprehensive than Dr. Reddy's letter, and file the motion then. Okay. Had he moved to withdraw the plea then, and we don't know what the court, you know, if the court would have then rescheduled the trial, Reddy could not testify until he recovered. On October 29th, he wasn't going to be recovered. If he gave the letter to the court and the court said, well, then we're going forward with trial because I don't think this is enough, which he later said in the plea withdrawal motion, so it's not, I'm not hypothesizing something that's out of the realm of possibility, then he would be faced with exactly the same decision he faced the Friday beforehand. Go to trial, unable to speak, unable to effectively communicate with the jury, unable to assist counsel or take a plea. He was in a position, and it's very unusual in the case law, and I know this court has said it is very important to act without delay, and there are good reasons for that, but it is very important in this case to understand that the delay is inextricably tied up with his physical condition. Reddy testified that he, it took him months, five or six months of speech therapy to be in numbers, that it wasn't until the spring of 2015 that he was able really to get the words out properly and in the proper order. He didn't wait because the wait, he waited because he needed to recover. Had he moved earlier and the court scheduled the trial earlier, he would have been back in the same position he was in on October 27th, facing a trial where he could not testify and had no choice but to plead guilty or go to what I think would have been a farcistical trial, an unfair trial. Okay, so has there been any effort made to get evidence from the neurologist besides just the report itself where the neurologist would work us through this and walk us through this and explain all the stuff that you're saying? There was, counsel put this all in his papers, there was not an actual status hearing on the day the court denied the continuance, so we don't have a back and forth where the court, and I think it was the court's obligation to do so. You didn't ask for a hearing. I'm not even talking about a hearing, I'm talking about a status conference first where they could have had a back and forth and the court could have said, Mr. Cassell, this just isn't enough. I've asked you for documentation, this isn't enough. I'll give you some time to get some more. This is what I want. It was done via a ruling. You're asking since then, what do we have from the neurologist, you said the October 29 neurologist, what do we have that would tell us that the neurologist thinks Mr. Reggie was incapable of doing the trial? The neurologist wrote, and I see my red light is on. I haven't answered the question. The neurologist wrote that he was unable to, the primary diagnosis was that he was unable to speak because of a brain lesion. The other documents that later counsel was able to obtain, given more time, reflected that when he was rushed to the ER at St. Tammany Parish, they said we've got to get him to a critical stroke unit immediately because he faces. Let me just be clear, has the neurologist since October 29, other than a one-line diagnosis kind of document from the medical records, written a narrative that I just haven't found in the record? I'm just, I'm looking, would I find a narrative from the neurologist explaining all the stuff you're saying? No, you wouldn't. I think the documents that are attached to the plea withdrawal motion are the documents. All right, counsel, thank you. Okay, thank you very much, Your Honors. You may proceed. Thank you, Your Honor. May it please the Court, Patricia Jones on behalf of the United States. Let me begin, if I may, by making a few corrections and additions to this timeline that was provided by defense counsel. I think for the most part it's accurate, but there is one inaccuracy and there are some substantial omissions. First of all, on October the 9th, when the court was advised of the defendant's stroke, that is the first time that Judge Dix specifically instructed the defense counsel to provide medical documentation addressing defendant's speech, cognitive, and physical abilities, and that was on October the 9th. Then we come to, it's correct that the rest of the things on the calendar, and then we get to October the 17th, when the continuance was granted based on Dr. Reddy's letter. The calendar indicates that the judge at that time granted only a one-week continuance, and that's not entirely accurate, because at that time, based on Dr. Reddy's letter that Mr. Reddy was hospitalized, she granted a continuance without date and set a status conference for October 20th. So it wasn't until October 20th, when counsel came to the status conference and indicated that Mr. Reddy was being discharged from the rehab facility, that the court decided that it was time to proceed to trial. And so that is when the one-week continuance is granted. Now, I know Judge Haynes has indicated that she found that it was outrageous that the court did not grant a continuance for longer than that, and I hope that I can convince you otherwise. At that time, Mr. Corsell, who was representing Mr. Reddy, his complaint was essentially that he didn't have time to prepare with Mr. Reddy. It really wasn't about, and he did mention Mr. Reddy had some speech impairments in that he spoke slowly, and that it took time to go over things with Mr. Reddy. But his complaint, if you read the transcript of the status conference, was, I don't know if I'll have enough time. It was simply, the judge said, you've had five months to prepare. You are ready. She had seen . . . I'll tell you the reason I think it was outrageous, and again, I'm speaking for myself. My colleagues may completely disagree, and that's fine. I was a state district judge for eight years. I was very tough on continuances. It was very difficult to get a continuance in my court. I could not imagine putting somebody to trial right after a moderate to severe stroke. I would not have needed 3,000 doctors to come and tell me that. One doctor saying it really happened, so I know it's true and not being made up as a story. Once I knew it was true and real, and this clearly was, and the judge clearly knew that, that would have been that. I certainly wouldn't be putting a criminal defendant facing 135 months of imprisonment to trial a week later. That's the reason I think it's outrageous. It's not, do I understand the progress, and the lawyer said this, and the letter wasn't that long, and all that. It's really because of that. To me, that's fairly fundamental, but that's just me, and that doesn't even get her to first base, frankly, on this whole appeal, so I don't know that you want to necessarily spend a lot of time on me on that, but it's up to you. Thank you, Your Honor. I appreciate that. I would also note that at the end of the status conference, and that is not reflected on this calendar, the judge again said, I will reconsider this if I am provided written attestation by a physician that addresses the issues I've raised, cognitive speech and physical ability to be there. Then finally, on October the 22nd, the second continuance was lost, excuse me, the second continuance, and at that time, the evidence that was produced by the defense counsel was essentially a discharge summary by the very same doctor who wrote the letter, and the discharge summary provided no limitations on Mr. Reggie's activities, essentially. I've provided a copy of that discharge record to the court for you to look at if need be during the oral argument, because it's not in the record excerpts, but the very same doctor who knew Reggie was involved in legal proceedings and had previously said that he could not be available discharges him with essentially no limitations. So those are the things that I think are significant that are left out. I also think that it's important to point out that Mr. Reggie did not request only a two-day continuance when he filed the second motion for continuance. The continuance motion specifically requested at least 30 days, at least 30 days. He didn't ask for a continuance to go to the neurologist and then provide medical evidence. He said, oh, by the way, I could provide you with more from the neurologist after two days, but he asked for 30 days. But at the time the second continuance was filed, he was that day going to have surgery  That's correct, Your Honor. Anyway, let me ask this, what would be necessary, so let's say that the failure to grant the continuance was wrong, but now we have this plea, so why don't we just, if you would accept my view for the moment, but now we have this plea hearing, and that to me is an intervening or superseding cause, if you will, and a new event we have to deal with. What would you think would be sufficient to cause a set-aside of that guilty plea if we accept Mr. Reggie's view that he was really under duress to do that? Your Honor, I think you would have to find that the plea was involuntary, under the standards set forth by the Supreme Court, which is that the plea was induced by threats, by lies, or by improper inducement. And that did not happen in this case. Reggie has provided no law to this court that a simple ruling by a district court, even if erroneous, can invalidate a plea. The Supreme Court held, in cases that I've cited in my brief, and then the McMahon case, which I cited in a 28-J letter, indicate that even unlawful conduct that motivates a plea does not invalidate that plea. For example, in the Brady v. United States case, the United States Supreme Court held that when the defendant pled guilty in order to avoid the death penalty under the federal kidnapping statute, which was later held unconstitutional, that there was no improper motivation, and that by pleading guilty, he had waived the challenge. Additionally, in the McMahon case, the Supreme Court held that coerced confessions did not invalidate the plea, even if those confessions are what motivated the defendants to plead guilty. Now, defense counsel, in responding to my 28-J letter, indicated that that case has no application here, because it was a habeas case, and the court was just ruling that there was no right to a hearing. However, the court specifically held that it did not render the plea involuntary. That was the holding of the court, the United States Supreme Court, in McMahon. And defense counsel cannot point to any law that says, if the judge rules against me, and I think I'm going to have a worse chance at trial, and I plead guilty, then my plea is not binding. OK, so what should Mr. Reggie have done if he really did need the continuance, but the judge wasn't satisfied, and he got the letters he could, because getting letters from doctors is an interesting experience in and of itself, anyway, did the best he could, he loses on the continuance, he feels wrongfully, what would be the proper course of action? He just really doesn't think he can sit through the trial, he's unable to speak, he's exhausted from surgery, whatever the problem is. What's he supposed to do? Your Honor, what he's supposed to do is go to trial, and argue the error on appeal. And the court pointed out, there wasn't any evidence provided that it would endanger Mr. Reggie by going to trial. He was going to his doctor's appointments, he wasn't bedridden, he wasn't hospitalized, he was able to leave his home and go places.  Now, if it impaired his ability to defend himself in trial, that is his issue for appeal. By pleading guilty, he left this court with no evidence about whether that's what would have happened or not. Defense counsel can't sit here and say that if he had gone to trial, he wouldn't have been able to testify, or he wouldn't have been able to do this, or he wouldn't have been able to do that. He didn't try. The court specifically said, at the status conference on October 20th, that she was mindful of the defendant's condition, and that she would take breaks as necessary. It's clear that she was willing to make accommodations. Defendant should have showed up at trial, he should have done the best that he could, and please don't take my saying the best that he could to mean that I think that he would have been impaired in his ability, other than he surely would have had a lessened ability to testify. It's clear from the record, and even the district court's holdings, that his ability to speak . . . Why should he be forced to trial when he has a lessened ability to testify, when he's a criminal defendant, and his credibility and his ability to communicate is critical, particularly in a financial case like this, where he's trying to argue that, you know, this guy Craig or whatever had worked this deal with him, or whatever his argument . . . I've never completely understood his position, but whatever it is, he needs to communicate it so the jury can understand and potentially agree with him. Your Honor, the Alexander case, which I've cited to the court, is precisely on point for that issue, is that even if the defendant has a lessened ability to testify, that doesn't mean that he is entitled to a continuance. In Alexander, this court found that the district court in the Eastern District of Louisiana, Judge Sear, did not abuse his discretion in denying a continuance, when it was established by testimony in court by the defendant's psychiatrist, that he had a lessened ability to communicate because of his anxiety. It was not a stroke case. It was a case about extreme anxiety. Okay, but was that condition going to get better? I mean, the thing is, here we have some anticipation that with a stroke victim, with therapy and so forth, you can get better. So in a case where the disability is sort of long-term and not going to get better, I could see that that might be a little bit of a different situation, but here the argument is, let me get better. He won't even give me thirty days to get better. There was no documentation or testimony or anything that he would be better in thirty days. The thirty days was really more of defense counsel asking, I would like more time to slow, and because I need more time to prepare. It really wasn't about giving him time to heal or to improve, and no medical evidence was produced that he would improve in thirty days or that he would ever improve. There was nothing in the record about that, and actually in the Alexander case, with that being a case about anxiety, I would think that anxiety would have a chance of improving as well, and I don't know whether there was testimony, of course, in that case about that or not. But we are sitting here trying to use what we know about strokes or what the court knows about strokes. That was not given to the court. The court did not have any information about, he is expected to improve in thirty days, so please give him that chance. It was that I would like more time to talk with him, which put him . . . Let me ask you how relevant you think this whole part of the appeal is. I don't use such strong language, maybe, as my colleague. Maybe I don't find it outrageous, but I do find it troubling that the district judge in a situation like this would not have allowed some more time, but our issue is certainly different. But any perhaps shortcomings on her part in not granting a continuance and insisting on doctor information when the person was having a heart procedure done and wouldn't be able to see the relevant doctor for two more days, whether all of that was fair or not, does all that get subsumed in the issues related to withdrawal of the guilty plea? Is that where we are? If you cannot show that the guilty plea properly had to be withdrawn, that any defects on the part of the continuance, on the judge on the part of the continuance, are sort of irrelevant? Yes, sir. I think that's exactly where we are. It does all get subsumed in the motion to withdraw because it is elementary that a judge waives non-jurisdictional errors. In the usual elements, there's certainly some practical reasonableness to what you're saying, but one thing that troubles me about this, the factors that we look at on whether to withdraw the guilty plea, there's not a lot of weight given to the sorts of things that we're talking about. Well, Your Honor, I think the weight is given in the voluntariness component of that standard. The Carr Factor does look at whether the plea was voluntary, and so you look at that and you find, yes, this plea was voluntary. All of the Carr Factors weigh against . . . Well, when Mary talks about coercion, I would look to coercion and those sorts of things. What we're looking at here are all the things that have been much discussed already in the last thirty minutes or whatever it is in here about his limited ability to participate with his lawyer, which would not come out at trial of how much participation and assistance he provided to his lawyer, and the reluctance of the lawyer to put his client through that, presumably, when he can't reasonably testify in a coherent fashion. I don't see that as being part of the voluntariness aspect of the Carr Factors. Your Honor, I think it probably goes just to the central issue of whether there's a fair and just reason overall, and in evaluating whether that reason is fair and just, then you can look at the Carr Factors. I don't think that that would be eliminated from the court's analysis, even if you don't find that it's subsumed within the voluntariness aspect of the Carr Analysis. One thing we haven't talked about is, judges, and I don't know why they don't just use a list of everything that you're supposed to cover under the rule, but judges sometimes overlook one aspect of, do you understand you have this right or that right, and we have case laws, well, that was harmless, and whatever. Here, because of the heightened problems with this day, shouldn't we be a little stricter with saying, you know, you didn't cover some important things, including, are you being coerced in this taking of the guilty plea? You asked some questions about, do you know what day it is, and who won the football game? These are things you're supposed to go over. We're not gone over, and while in other cases, we may say, well, that just doesn't seem to have any impact, so we'll find it to be harmless there, in this one where maybe we ought to be, you know, you have a judge who's kind of throwing the book at the defendant, shouldn't we throw the book at the judge and say, you didn't really follow the book? Your Honor, I understand your concern, and I'm not exactly sure why the court overlooked those matters. I think it may have been that she was spending her time focusing on whether the defendant, what was going on, and so she asked all of those questions about the Saints and about his background and about his address, and can he understand current affairs? Can he read the newspaper? Can he handle his finances? She was focused on that, and that may be an explanation. But regardless of what the explanation is, I think it's still truly harmless. The defendant indicated that the reason that he pled guilty is because he did not think he could go to trial. And so had the court said, ask the question that Rule 11 requires, have you been subjected to any force, threats, or promises, the defendant's answer would have to be no. I mean, I don't know. That email, to me, is pretty threatening. You better plead guilty on Monday or we are going to trial that afternoon. To me, that has a very threatening quality to it, not threats in the way of like your wife will be killed, not that kind of threat. But the argument that counsel, the opposite, is making is, had that question been asked, that may have been the moment when he would break down and go, yeah, I mean, I'm here, I'm just, I'm desperate. I'm here making this plea because you've put me in this just untenable situation. And that was never, and that's why that kind of question is asked, and it doesn't always go the way you expect as the judge. I mean, sometimes there is this breakdown and we've seen that. So isn't that why those kinds of questions are important? Your Honor, even at the motion to withdraw, the defendant said that he was pleading because he didn't feel he could go to trial. That had all been, that was already before the district judge. Everybody knew the defendant didn't think he could go to trial. This was no new information, I think, that would have been elicited had the court said, were you forced, were you threatened? And in fact, the defendant said when he testified at the motion to withdraw, I would have just said anything. I was ready to get out of there, I had given up, I would have said anything. So it doesn't make sense, I think, to believe that he would have said, Your Honor, you threatened me and I would not go to trial except for the fact that you threatened me and I do want to go, I don't want to plead guilty, I want to go to trial. He didn't want to go to trial. So he wouldn't have tried to say, I want to go to trial. He couldn't go to trial that day because he couldn't even say 84, he had to say 84. I mean, to me, reading that transcript doesn't really support your position, it supports theirs. It's awful. He said things in an odd way, specifically numbers. But the judge who was there said she thought that he answered clearly and directly, she understood everything, the court reporter understood everything. He didn't hesitate in giving answers. He was able to make himself understood even if he said 84 instead of 84. And he could have done that at trial. But I think the key point is that it was voluntary, there was no force, there was no threat. As far as his rights that he was not given, most of those rights were rights that he had been advised of in the past, rights that he was actually exercising at that moment, such as his right to counsel. There is no indication that if the court had explained his rights in any further detail that he wouldn't have pled. He made it quite clear that he had given up and was going to plead no matter what because he didn't want to go to trial. And if I could say about the email, the email did not come until after defendant indicated he was ready to plead guilty. But it's before the plea hearing, and until the plea hearing, you could easily say, you know, I thought I was going to plead, but I'm not, I'm asserting innocence. And all the email said was, well, if you choose not to plead, you're going to go to trial. She was basically enforcing her ruling on the continuance, saying that she wasn't going to have a backdoor continuance by coming into court and saying you're going to plead and then not. The jury will be there. It's the tone that makes the music, right? So we really don't know how he heard the email. I hear it as a threat, you hear it as this, well, you know, just letting you know. Yes, Your Honor. Thank you. Thanks. I'm going to try to address quickly a few points. First of all, one of the things my adversary said is that there's, there's no law. And I think I haven't been able to find a case like this one. The counsel for the government cited many cases where continuances were held not to be an abuse of discretion. And in each one of those cases, the court did more. The court did not abdicate its responsibility to determine whether the defendant was capable of standing trial. There were continuances. There were hearings. There were direct phone calls to doctors. Is it your position that the plea was coerced? Yes. It is definitely our position that . . . So how does this fall in the category of threats, that was a list, improper, you know, promises, improper inducements? And one thing the Supreme Court has added in describing those is mental coercion, overbearing the defendant's will to go to trial, which is what I think we have here. Frankly, you know, I don't want to disparage a trial judge, but I believe that email was a threat. It said, if you do not go to trial for whatever reason, if you don't take a plea for whatever reason, you're going to trial Monday afternoon. And I do view that as a threat. For the most part, do a terrific job, but they make mistakes. They make wrong rulings, maybe really wrong, really, really, really wrong rulings. And we don't say, as your counsel opposite went over in detail, we don't say, well, that's coercive. You denied my motion to suppress the evidence. You denied my, you know, allegation of this or that. And the judge rules incorrectly. That's kind of why the three of us are here, to address that. We don't typically view that as a threat or coercion or an improper . . . or taking away the voluntariness of the plea, the fact that the district judge makes an erroneous ruling, even a super erroneous ruling. This is a different kind of erroneous ruling. I think, you know, when a district court rules on evidence, says I'm going to allow it for a 4B evidence, or I disagree and I think the suppressed evidence should come in, it's very different. It doesn't, you know, the defendant then really has a choice. Am I going to be, you know, with this evidence, what are my odds of an acquittal? That's not this case. We can try to make it this case, but that's not this case. It was, can I go to trial at all? I can't go to trial at all. This court has asked me a lot of questions I feel like I haven't adequately answered them about intervening causes. But I think what's at issue is whether this unconditional plea wipes out the ability to independently object to the failure to grant a continuance. That is generally true for, unless it's a jurisdictional defect. But there are two circumstances where it's not true. One is if the plea is not truly voluntary, and of course that is our main position here. But two, and this court did so in a case called Sanchez v. Guero, if there's a fundamental right at issue that constitutes structural error, in that case it was inability to, I think the court denied right to specific counsel of its choosing. And what this court said is that even though it was an unconditional plea, we can't go back and look at what would have happened. We can't do a harmless error analysis of what would have happened if you had had counsel. And that type of structural error sort of supersedes the rule that, or trumps the rule that says unconditional pleas are inviolate. Is counsel ineffective for allowing his client to plead guilty without process? That would be a question for another day, and I certainly don't want to rule out the possibility that someday there may be a 2255. But counsel did face, as I say, the same Hobson's choice. He knew he couldn't put his client on the stand, and that was the fulcrum of the defense. And he knew that he had no . . . really the defense was predicated on his client's testimony. So he also . . . it was go to trial without a defense or let Reggie plead guilty without a deal. I don't . . . you know, the record doesn't reflect what conversations they had over the weekend, what advice counsel gave. If the client is incapacitated or unable to make decisions, how can he make a decision like that? How can you let him make a decision like that? Don't you have an obligation to say . . . Perhaps . . . Your Honor, I'm in an untenable position, because I have a client who wants to plead guilty because he feels sort of forced into it, but I don't think he really is in a position to make those decisions, so I don't really want to know what to do here, Your Honor. Perhaps that's something that could be raised a little later. We don't have a record for that now, and I think that would come up in a 2255. There was also the question of whether he knew he was pleading guilty, and yes, he did. I mean, he knew, and he could answer questions. Counsel, your time is up, but I'll give you one more minute to . . . Okay. But I do want to point out that he said many times at the plea withdrawal hearing that his memory was very much affected by what took place, and he had to keep asking Mr. Corselli afterwards what happened, what happened, what happened. So yeah, maybe at the moment he knew he was pleading guilty. I'm not sure we can really say with confidence that he knew what he was pleading guilty to, and he knew why he was . . . other than that he had to plead guilty because he had no other choice. I think this conviction is unfair in this case, and it should be reversed. Thank you very much for your patience. Thank you both. Bring this case to a . . .